**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

OLIVER CLINTON GRIER, JR., )
)
      Plaintiff, )
)
v. )     Civil Action No. 18-386-SRF
)
NANCY A. BERRYHILL, )
Acting Commissioner of Social Security, )
)
      Defendant. )

## MEMORANDUM OPINION

## I.    INTRODUCTION

Plaintiff Oliver Grier ("Grier") filed this action on March 12, 2018 against the defendant

Nancy A. Berryhill, the Acting Commissioner of the Social Security Administration (the

"Commissioner"). Grier seeks judicial review pursuant to 42 U.S.C. § 405(g) of the

Commissioner's January 16, 2018 final decision, denying Grier's claim for supplemental

security income ("SSI") under Title XVI of the Social Security Act (the "Act"), 42 U.S.C. §§

401-434 and §§ 1381-1383f. This court has jurisdiction over the matter pursuant to 42 U.S.C. §

405(g).[1]

Currently before the court are cross-motions for summary judgment filed by Grier and

the Commissioner.[2] (D.I. 12; D.I. 16) Grier asks the court to remand his case for further

administrative proceedings. (D.I. 13 at 20) The Commissioner requests the court affirm the

---

[1] The parties consented to the jurisdiction of a magistrate judge to conduct all proceedings in this matter through final judgment and the case was assigned to the undersigned judicial officer on July 13, 2018. (D.I. 11)

[2] The briefing for the present motion is as follows: Grier's opening brief (D.I. 13), the Commissioner's combined opening brief in support of her motion for summary judgment and answering brief (D.I. 17), and Grier's reply brief (D.I. 18).

Administrative Law Judge's ("ALJ") decision. (D.I. 17 at 15)  For the reasons set forth below,

Grier's motion for summary judgment is denied (D.I. 12), and the Commissioner's cross-motion

for summary judgment is granted (D.I. 16).

## II.    BACKGROUND

### A. Procedural History

Grier filed a SSI application on September 27, 2013,[3] claiming a disability onset date of

August 27, 2013.  (D.I. 9-2 at 21; D.I. 9-6 at 2)  His claim was initially denied on January 7,

2014, and denied again after reconsideration on August 14, 2014.[4]  (D.I. 9-4 at 2-6, 10-14)  Grier

then filed a request for a hearing, which occurred on September 12, 2016.  (D.I. 9-2 at 37-67)

Administrative Law Judge Jack Penca issued an unfavorable decision, finding that Grier was not

disabled under the Act on October 11, 2016.  (*Id.* at 21-31)  The Appeals Council subsequently

denied Grier's request for review on January 16, 2018, rendering the ALJ's decision the final

decision of the Commissioner.  (*Id.* at 2-5)

On March 12, 2018, Grier brought a civil action in this court challenging the ALJ's

decision.  (D.I. 1)  On September 4, 2018, Grier filed a motion for summary judgment, and on

November 15, 2018, the Commissioner filed a cross-motion for summary judgment.  (D.I. 12;

D.I. 16)

### B. Medical History

Grier was born on September 3, 1989, and was 23 years old on his alleged disability

onset date.  (D.I. 9-2 at 30)  Grier attended school through the eleventh grade, but did not

---

[3] The ALJ noted that Grier filed this application on August 27, 2013, but the application is dated
September 27, 2013.  (D.I. 9-2 at 21; D.I. 9-6 at 2)
[4] The ALJ stated that Grier's claim was denied upon reconsideration on August 10, 2014, but the
record shows that Grier's disability reconsideration notice was dated August 14, 2014.  (D.I. 9-2
at 21; D.I. 9-4 at 10-14)

graduate from high school. (*Id.* at 49) Grier has no past relevant work history. (*Id.* at 30) The ALJ concluded that Grier has the following severe impairment: schizophrenia. (*Id.* at 23)

On November 18, 2013, Grier saw Dr. Kimberly Watson ("Dr. Watson"),[5] who opined that Grier had bipolar disorder, social anxiety disorder, and paranoid personality features. (D.I. 9-9 at 53-56) Grier stated that he "get[s] paranoid and uncomfortable" around people. (*Id.* at 53) Grier registered a Global Assessment of Functioning ("GAF") score of 57.[6] (*Id.* at 56) On December 2, 2013, Dr. Watson conducted a Psychological Functional Capacities Evaluation and found that Grier had moderate limitations[7] in his abilities to relate to other people and cope with the pressure of ordinary work. (*Id.* at 58-59)

On March 16 and 17, 2014, Grier was hospitalized due to his aggressive behavior and acute psychosis. (D.I. 9-10 at 2, 41) Grier failed to regularly take his medication and he had

---

[5] Dr. Watson is a state agency psychologist who examined Grier at the request of the agency. (D.I. 9-9 at 53-56)

[6] The GAF scale ranges from 0 to 100 and is used by a clinician to indicate his overall judgment of a person's psychological, social, and occupational functioning on a scale devised by the American Psychiatric Association. *See Robinson v. Colvin*, 137 F. Supp. 3d 630, 635 n.5 (D. Del. 2015) (citing American Psychiatric Association, *Diagnostic & Statistical Manual of Mental Disorders* (Text Revision, 4th ed. 2000) (*DSM-IV-TR*)). A GAF score of 21-30 indicates that an individual's "[b]ehavior is considerably influenced by delusions or hallucinations or the individual has a serious impairment in communication or judgment . . . or [an] inability to function in almost all areas." *Sweeney v. Comm'r of Soc. Sec.*, 847 F. Supp. 2d 797, 802 n.1 (W.D. Pa. 2012). A GAF of 31-40 indicates "[s]ome impairment in reality testing or communication (e.g., speech is at times illogical, obscure, or irrelevant) OR major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood (e.g., depressed man avoids friends, neglects family, and is unable to work . . . )." *Robinson*, 137 F. Supp. 3d at 635 n.5. A GAF of 41-50 indicates "[s]erious symptoms (e.g. suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)." *Id.* A GAF score of 51-60 indicates "[m]oderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g. few friends, conflicts with peers or co-workers)." *Id.*

[7] A moderate limitation is "an impairment which affects but does not preclude ability to function." (D.I. 9-9 at 59)

become increasingly paranoid and delusional, believing that the government had put a computer chip in his head. (*Id.* at 41) Following his hospitalization, Grier was admitted to Delaware Psychiatric Center on March 17, 2014. (*Id.*; D.I. 9-11 at 4) On March 19, 2014, Delaware Psychiatric Center conducted a psychological assessment of Grier. (D.I. 9-10 at 41-43) Grier was diagnosed with schizophrenia and his "psychotic symptoms suggest[ed] an underlying chemical imbalance that require[d] maintenance with pharmacological interventions." (*Id.* at 42-43) Grier had a GAF score of 40. (*Id.* at 44)

Grier was discharged from the Delaware Psychiatric Center on April 22, 2014. (D.I. 9-11 at 4) His discharge notes show his progressive improvement while on his medications and the significant improvement of his paranoia symptoms. (*Id.* at 6) Grier registered a GAF score of 55. (*Id.*) Grier denied suicidal ideations, homicidal ideations, and auditory hallucinations. (*Id.*) On April 28, 2014, Dr. Ralph Kaufman ("Dr. Kaufman")[8] stated that Grier had problems with hallucination, delusion, and paranoia, but seemed calm, cooperative, and conversational. (D.I. 9-12 at 32-34) Grier experienced auditory hallucinations through May 2014. (D.I. 9-14 at 8)

On June 30, 2014, Grier visited Dr. Kaufman, who noted that Grier reported some panic attacks, and experienced boredom and delusions. (*Id.* at 10) On July 2, 2014, Grier's case manager at Resources for Human Development ("RHD")[9] completed a Disability Determination Services Report, summarizing that Grier suffered from poor concentration and memory, auditory hallucinations, lack of motivation and energy, mood swings, and paranoia. (D.I. 9-12 at 6-8) Grier's case manager stated that "with continued care and support from RHD, Grier will be able

---

[8] Dr. Kaufman is Grier's former psychiatrist. (D.I. 9-16 at 38-39)

[9] Grier states in his briefing that this report was conducted by Carlos Mackell ("Mr. Mackell"). (D.I. 13 at 5-6) The name of the report's author is difficult to discern in the record, and the ALJ refers to the author as Grier's case manager. (D.I. 9-2 at 28; D.I. 9-12 at 6-9)

4

to change, recover, and grow," but Grier's "condition has cause[d] him to not be capable of working at this time." (*Id.* at 9) Grier visited Dr. Kaufman on July 21, 2014 and stated that he felt better but still heard voices. (D.I. 9-14 at 12) On July 28, 2014, Dr. Kaufman noted that Grier had a positive response to medication and felt more alert and confident. (*Id.* at 13)

On October 7, 2014, Grier was referred to the Rockford Center from Wilmington Hospital for psychiatric stabilization after he experienced auditory hallucinations, severe paranoia, agitation, and a violent disposition. (D.I. 9-18 at 19) Grier registered a GAF score of 25 when he was admitted. (*Id.* at 20) On October 17, 2014, Grier was discharged and denied suicidal and homicidal ideation. (D.I. 9-13 at 18) Furthermore, he exhibited fair judgment with adequate impulse control, and registered a GAF score of 50. (D.I. 9-18 at 21)

During a follow up appointment with Dr. Kaufman on October 20, 2014, Grier reportedly felt better after being hospitalized and was lifting weights and doing chores. (D.I. 9-14 at 14) He was not exhibiting delusional symptoms and had no racing thoughts, but was slightly anxious. (*Id.*) Grier stated that he found large groups of people intimidating. (*Id.*) On November 10, 2014, Grier told Dr. Kaufman that he felt that his schizophrenic symptoms were decreasing and that he had been enjoying helping his grandfather work in his garden. (*Id.* at 19)

On January 6, 2015, RyeNeysa Gregory, RN ("Ms. Gregory") noted that Grier's mental status had not declined and that his medications were reportedly working. (*Id.* at 46) On February 1, 2015, Dr. Kaufman observed that Grier had a GAF score of 45 and had occasional problems with hallucinations, delusions, and isolation, but was calmer and less paranoid. (D.I. 9-15 at 11-12) The following day, Dr. Kaufman completed a medical certification form for Grier, wherein he opined that Grier's mental impairments would last more than twelve months. (D.I. 9-13 at 16) Dr. Kaufman also concluded that Grier was unable to work at his usual occupation and

should not be permitted to perform any work on a full time basis. (*Id.*) During a follow up appointment with Dr. Kaufman on April 6, 2015, Grier stated that he had been playing basketball and helping around the house. (D.I. 9-15 at 22) Dr. Kaufman observed that Grier experienced occasional delusional thinking "that does not appear to impact him so much." (*Id.*)

On June 2, 2015, Grier visited Dr. Kaufman and indicated that he had recently experienced two anxiety attacks and was under the impression that his medication may have caused them. (*Id.* at 30) Dr. Kaufman encouraged Grier to become more social despite his anxiety. (*Id.*) During a follow up appointment on June 15, 2015, Grier reported having a few panic attacks and anxiety, but followed Dr. Kaufman's advice on socializing and recently went fishing. (*Id.* at 31) From August through November 2015, Grier reported occasional anxiety, but denied hallucinations and participated in more social activities. (*Id.* at 37, 42) On January 11, 2016, Grier stated that he had been enjoying playing video games with friends and Dr. Kaufman noted Grier was more outgoing despite his occasional anxiety. (D.I. 9-16 at 15) On February 8, 2016, Grier stated that he sometimes felt uncomfortable when he goes outside. (*Id.* at 28-29)

On March 3, 2016, Grier started seeking Dr. Lavinia Park ("Dr. Park")[10] after being transferred from Dr. Kaufman. (*Id.* at 38-39) Grier reported that he experienced panic attacks and anxiety. (*Id.* at 38) Furthermore, Dr. Park noted that Grier's medication regimen was helpful and that Grier was attempting to use coping skills to combat his anxiety. (*Id.*) On March 7, 2016, Dr. Park prepared a medical certification form for Grier, wherein she opined that Grier's mental impairments would last more than twelve months and that Grier needed some

---

[10] Dr. Park is Grier's psychiatrist, who continues to provide treatment. (D.I. 9-2 at 43-45; D.I. 9-16 at 38-39)

supervision. (D.I. 9-13 at 38) Furthermore, Dr. Park concluded that Grier was unable to work at his usual occupation and should not be permitted to perform any work on a full time basis. (*Id.*) On April 15, 2016, Grier stated that he was going out more every day and was continuing to exercise and fish with his family. (D.I. 9-17 at 11-12) On April 20, 2016, Dr. Park noted that Grier had been challenging himself to be more social by engaging in activities outside of his home despite his anxiety and discomfort around other people. (*Id.* at 13-14) In a series of follow up appointments from April to June 2016, Grier reported that he was managing his anxiety well. (*Id.* at 15-16, 19-20, 23-26, 28-31)

On June 16, 2016, Grier stated that he enjoyed going out much more than he had previously, but still experienced anxiety. (D.I. 9-21 at 3-4) Furthermore, Grier reported that he felt like he had been making progress and that his anxiety had improved. (*Id.*) During a psychiatric evaluation with Dr. Park on July 8, 2016, Grier reported that he had been swimming and doing yard work. (*Id.* at 5) Grier stated he was "not so scared about the community" and recognized the importance of challenging himself socially. (*Id.* at 5) Grier explained that he was afraid of people hearing his thoughts, but felt like he was making progress. (*Id.*) He stated that he was attempting to walk around the neighborhood by himself. (*Id.*)

On August 10, 2016, Dr. Park noted that Grier experienced anxiety, paranoia, and panic attacks, but was managing these symptoms well with medication. (*Id.* at 7-8) Grier was staying active and was happy with his weight loss. (*Id.*) Dr. Park also completed a Mental Impairment Questionnaire which noted that Grier's abilities were "poor" in a number of areas, including: working in coordination with or in proximity to others without being unduly distracted, dealing with stress of semiskilled and skilled work, interacting appropriately with the general public, and travelling in an unfamiliar place. (*Id.* at 10-16) Dr. Park opined that Grier had marked

difficulties in maintaining social functioning and concentration, persistence, and pace. (*Id.* at 15) Dr. Park indicated that despite compliance with medication, Grier continued to experience high levels of anxiety and panic attacks. (*Id.* at 11) Furthermore, Dr. Park asserted that Grier's anxiety related disorder results in the "complete inability to function independently outside the area of [his] home." (*Id.* at 15)

### C. Hearing Before ALJ Penca

#### 1. Grier's Testimony

Grier testified that he currently lives at his mother's house with his mother, brother, sister, nephew, and uncle. (D.I. 9-2 at 43) Grier testified that he currently sees Dr. Park once per month for his schizophrenia, paranoia, anxiety, and depression. (*Id.* at 43-45) Grier stated that he saw Dr. Kaufman for approximately three and a half years before transferring to Dr. Park's care. (*Id.* at 44) He testified that he takes a large number of medications, but feels that they are becoming less effective. (*Id.* at 45, 55) Grier testified that he was previously hospitalized after he punched a hole in his mother's wall and stopped taking his medication because of the voices in his head. (*Id.* at 47) Grier stated that he still hears voices and that they sometimes cause him to become upset and make him "want to go on a rage like outburst." (*Id.* at 47-48)

Grier stated that he starts his days by taking his medication, pacing around his mother's house, and opening up the windows to check outside. (*Id.* at 51) If the weather is nice, Grier spends about five to ten minutes outside before coming back inside the house. (*Id.*) He testified that he leaves the house approximately two times per week: once when he goes to the store with his mother and once when he visits his grandparents' house. (*Id.* at 48) When he goes to the store with his mother, he does not drive and goes inside the store for approximately five minutes before returning to the car to wait for his mother to finish shopping. (*Id.* at 48, 54) He

occasionally goes to various stores, including 7-Eleven, Getty, the Dollar Store, and Shop Rite. (*Id.* at 56) Grier sometimes spends time with his cousin, but only if his cousin comes over to his house. (*Id.*) Grier also testified that he does not believe he is capable of working, because he does not feel comfortable with the community and is scared of other people. (*Id.* at 48, 54)

When asked if he had experienced any change in his condition, Grier testified that he believed his condition was worsening. (*Id.* at 53) Grier testified that he does not want to continue "do[ing] nothing," but wants to "enjoy life and go out and do things." (*Id.*) Grier does not have any plan with his doctor to get him out of the house more or become employed. (*Id.*)

### 2. Grier's Mother's Testimony

Michele Rae Grier ("Ms. Grier"), Grier's mother, testified that Grier has no hobbies and no friends. (*Id.* at 58) She stated that Grier continually paces around the house and when people come over, he confines himself to his room. (*Id.*) He rarely leaves the house, and when he does, he is usually only able to stay outside for five minutes at a time. (*Id.*) She testified that Grier occasionally visits his grandparents' house and helps them with yard work. (*Id.* at 63) Ms. Grier stated that Grier recently spent time with his brother and cousins watching a football game, but intermittently left to spend time alone in the kitchen or in his room. (*Id.*)

Ms. Grier testified that Grier is currently medication compliant and occasionally does household chores and cooks for himself. (*Id.* at 59, 61-62) However, Grier needs to be reminded to take baths and cut his hair. (*Id.* at 61) She also testified that she does not believe Grier would be medication compliant if he had to take care of himself. (*Id.* at 61-62) Grier can remember instructions, but forgets things frequently. (*Id.* at 62) She does not think that Grier can work because of his paranoia, random emotional breakdowns, and inability to stay focused. (*Id.* at 59-60, 62)

### 3. Vocational expert testimony before the ALJ

The ALJ posed the following hypothetical to the vocational expert ("VE"):

Doctor, I'd like you to assume an individual the claimant's age, education, and work history who can perform work at all exertion levels, performing simple, unskilled tasks with no fast-pace or strict production requirements with occasional interaction with coworkers that does not require team work, or tandem tasks and no interaction with the public. Are there jobs that this individual could perform?

(*Id.* at 65) The VE testified that this individual would be able to perform the work of a floor waxer at the medium exertional level, garment folder at the light exertional level, and taper for printed circuit boards at the sedentary exertional level. (*Id.* at 65-66) The ALJ then inquired whether being "off task" and unfocused for fifteen percent of the workday would affect this individual's ability to be employed. (*Id.* at 66) The VE testified that there would be no work for that individual. (*Id.*)

### D. The ALJ's Findings

Based on the factual evidence in the record and the testimony by Grier and the VE, the ALJ determined that Grier was not disabled under the Social Security Act for the relevant time period of August 27, 2013, the alleged onset date of his disability, through October 11, 2016, the date of the decision. (D.I. 9-2 at 31) The ALJ found, in pertinent part:

1. The claimant has not engaged in substantial gainful activity since August 27, 2013, the application date (20 CFR 416.971 *et seq.*).

2. The claimant has the following severe impairment: schizophrenia (20 CFR 416.920(c)).

3. The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 416.920(d), 416.925 and 416.926).

4. After careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform a full range of work at all exertional levels but with the following nonexertional limitations: simple, unskilled

tasks; no fast pace or strict production requirements; occasional interaction with co-workers, with no teamwork or tandem tasks; and no interaction with the public.

5. The claimant has no past relevant work (20 CFR 416.965).

6. The claimant was born on September 3, 1989, and was 23 years old, which is defined as a younger individual age 18-49, on the date the application was filed (20 CFR 416.963).

7. The claimant has a limited education and is able to communicate in English (20 CFR 416.964).

8. Transferability of job skills is not at issue because the claimant does not have past relevant work (20 CFR 416.968).

9. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 416.969 and 20 CFR 416.969(a)).

10. The claimant has not been under a disability, as defined in the Social Security Act, since August 27, 2013, the date the application was filed (20 CFR 416.920(g)).

(*Id.* at 23-31)

## III.   STANDARD OF REVIEW

Findings of fact made by the ALJ, as adopted by the Appeals Council, are conclusive if they are supported by substantial evidence. *See* 42 U.S.C. §§ 405(g), 1383(c)(3) (2015). Judicial review of the ALJ's decision is limited to determining whether "substantial evidence" supports the decision. *See Monsour Med. Ctr. v. Heckler*, 806 F.2d 1185, 1190 (3d Cir. 1986). In making this determination, a reviewing court may not undertake a de novo review of the ALJ's decision and may not re-weigh the evidence of record. *See id.* In other words, even if the reviewing court would have decided the case differently, the court must affirm the ALJ's decision if it is supported by substantial evidence. *See id.* at 1190-91.

Substantial evidence is defined as less than a preponderance of the evidence, but more than a mere scintilla of evidence. *Jones v. Barnhart*, 364 F.3d 501, 503 (3d Cir. 2004) (quoting *Jesurum v. Sec'y of the U.S. Dep't of Health & Human Servs.*, 48 F.3d 114, 117 (3d Cir. 1995)). As the United States Supreme Court has explained, substantial evidence "does not mean a large or considerable amount of evidence, but rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Pierce v. Underwood*, 487 U.S. 552, 565 (1988) (internal quotation marks omitted).

Thus, in the context of judicial review under § 405(g):

> [a] single piece of evidence will not satisfy the substantiality test if [the ALJ] ignores, or fails to resolve, a conflict created by countervailing evidence. Nor is evidence substantial if it is overwhelmed by other evidence – particularly certain types of evidence (e.g., that offered by treating physicians) – or if it really constitutes not evidence but mere conclusion.

*Brewster v. Heckler*, 786 F.2d 581, 584 (3d Cir. 1986) (quoting *Kent v. Schweiker*, 710 F.2d 110, 114 (3d Cir. 1983)). Where, for example, the countervailing evidence consists primarily of a claimant's subjective complaints of disabling pain, the ALJ "must consider the subjective pain and specify his reasons for rejecting these claims and support his conclusion with medical evidence in the record." *Matullo v. Bowen*, 926 F.2d 240, 245 (3d Cir. 1990).

"Despite the deference due to administrative decisions in disability benefits cases, 'appellate courts retain a responsibility to scrutinize the entire record and to reverse or remand if the [Commissioner]'s decision is not supported by substantial evidence.'" *Morales v. Apfel*, 225 F.3d 310, 317 (3d Cir. 2000) (quoting *Smith v. Califano*, 637 F.2d 968, 970 (3d Cir. 1981)). "A district court, after reviewing the decision of the [Commissioner] may, under 42 U.S.C. § 405(g) affirm, modify, or reverse the [Commissioner]'s decision with or without a remand to the [Commissioner] for a rehearing." *Podedworny v. Harris*, 745 F.2d 210, 221 (3d Cir. 1984).

## IV. DISCUSSION

### A. Disability Determination Process

The core issue in this case is whether Grier was disabled within the meaning of the Act at any time from August 27, 2013, the alleged onset date, through the date of the ALJ's decision, October 11, 2016. (D.I. 9-2 at 31) Title II of the Social Security Act affords insurance benefits "to persons who have contributed to the program and who suffer from a physical or mental disability." *Bowen v. Yuckert*, 482 U.S. 137, 140 (1987) (citing 42 U.S.C. § 423(a)(l)(D) (2015)). A disability is the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(l)(A). A claimant is only disabled if his impairments are so severe that he is unable to do his previous work or engage in any other kind of substantial gainful work existing in the national economy. *See id.* § 423(d)(2)(A); *Barnhart v. Thomas*, 540 U.S. 20, 21-22 (2003). To qualify for disability insurance benefits, a claimant must establish that he was disabled prior to the date he was last insured. *See* 20 C.F.R. § 404.131 (2016); *Matullo*, 926 F.2d at 244.

The Commissioner must perform a five-step analysis to determine whether a particular claimant has met his burden of establishing disability. *See* 20 C.F.R. §§ 404.1520, 416.920; *Plummer v. Apfel*, 186 F.3d 422, 427-28 (3d Cir. 1999). If the Commissioner makes a finding of disability or non-disability at any point in the sequential process, the Commissioner will not review the claim further. *See* 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4)(i). At step one, the Commissioner determines whether the claimant is engaged in any substantial gainful activity. *See id.* §§ 404.1520(a)(4)(i), 416.920(a)(4)(i) (mandating finding of non-disability when

13

claimant is engaged in substantial gainful activity). If the claimant is not engaged in substantial gainful activity, step two requires the Commissioner to determine whether the claimant is suffering from a severe impairment or a severe combination of impairments. *See id.* §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii) (mandating finding of non-disability when claimant's impairments are not severe). If the claimant's impairments are severe, at step three, the Commissioner compares the claimant's impairments to a list of impairments that are presumed severe enough to preclude any gainful work. *See id.* §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii); *Plummer*, 186 F.3d at 428. When a claimant's impairment or its equivalent matches a listed impairment, the claimant is presumed disabled. *See* 20 C.F.R. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii). If a claimant's impairment, either singly or in combination, fails to meet or medically equal any listing, the analysis continues to step four and five. *See id.* §§ 404.1520(e), 416.920(e).

At step four, the ALJ considers whether the claimant retains the residual functional capacity (the "RFC") to perform his past relevant work. *See id.* §§ 404.1520(a)(4)(iv), 416.920(a)(4)(iv) (stating claimant is not disabled if able to return to past relevant work); *Plummer*, 186 F.3d at 428. A claimant's RFC is "that which an individual is still able to do despite the limitations caused by his or her impairment(s)." *Fargnoli v. Massanari*, 247 F.3d 34, 40 (3d Cir. 2001). The claimant bears the burden of demonstrating the inability to return to past relevant work. *See Plummer*, 186 F.3d at 428.

If the claimant is unable to return to past relevant work, at step five, the Commissioner must demonstrate that the claimant's impairments do not preclude him from adjusting to any other available work. *See* 20 C.F.R. §§ 404.1520(g), 416.920(g) (mandating finding of non-disability when claimant can adjust to other work); *Plummer*, 186 F.3d at 428. In other words,

the Commissioner must prove that "there are other jobs existing in significant numbers in the national economy which the claimant can perform, consistent with her medical impairments, age, education, past work experience, and [RFC]." *Plummer*, 186 F.3d at 428. The ALJ must analyze the cumulative effect of all the claimant's impairments in determining whether he or she is capable of performing work and is not disabled. *See id.* The ALJ often seeks the VE's assistance in making this finding. *See id.*

### B. Whether the ALJ's Decision is Supported by Substantial Evidence

On October 11, 2016, the ALJ found that Grier was not disabled from the alleged disability onset date of August 27, 2013 through the date of the ALJ's decision. (D.I. 9-2 at 31) The ALJ concluded that, despite Grier's severe impairment (schizophrenia), he had the RFC to perform a full range of work at all exertion levels. (*Id.* at 25) Grier asserts four main arguments on appeal: (1) the ALJ failed to provide adequate reasons for affording the opinions of Grier's treating sources no weight; (2) the ALJ's RFC finding was inaccurate, which in turn tainted the VE's testimony; (3) the ALJ erred when he failed to recontact Dr. Kaufman and Dr. Park in order to address inconsistencies associated with their medical opinions; and (4) the ALJ erred as a matter of law when he failed to consider Grier's supportive living environment. (D.I. 13 at 4-20)

#### 1. Medical Opinion Evidence

Grier first argues that the ALJ erred by failing to provide adequate reasons for rejecting and assigning "no weight" to the medical opinions of Dr. Kaufman, Dr. Park, and Mr. Mackell. (*Id.* at 2-9) Specifically, Grier contends that the ALJ failed to evaluate the medical opinions pursuant to the factors outlined in 20 C.F.R § 416.927(c) when assessing Grier's RFC. (*Id.* at 7-9) These factors include: examining relationship, treating relationship, supportability,

consistency, and specialization. *See* 20 C.F.R. § 416.927(c). Furthermore, Grier suggests that the ALJ relied on his own lay judgment to discredit Grier's treating sources' medical opinions. (D.I. 13 at 10, 14, 17)

Although the findings and opinions of treating physicians are entitled to substantial weight, "'[t]he law is clear . . . that the opinion of a treating physician does not bind the ALJ on the issue of functional capacity.'" *Chandler v. Comm'r of Soc. Sec.*, 667 F.3d 356, 361 (3d Cir. 2011) (quoting *Brown v. Astrue*, 649 F.3d 193, 197 n.2 (3d Cir. 2011)). Instead, the determination of RFC and disabilities are issues reserved for the Commissioner. *See* 20 C.F.R. § 416.927(d)(2). Moreover, "[a] treating source's opinion is not entitled to controlling weight if it is 'inconsistent with other substantial evidence in [the] case record.'" *See Scouten v. Comm'r of Soc. Sec.*, 722 F. App'x 288, 290 (3d Cir. 2018) (quoting 20 C.F.R. § 404.1527(c)(2)). It is not for the court to re-weigh the medical opinions in the record, but rather to "determine whether substantial evidence exists to support the ALJ's weighing of those opinions." *Ransom v. Berryhill*, C.A. No. 17-939-LPS, 2018 WL 3617944, at *7 (D. Del. July 30, 2018) (citing *Gonzalez v. Astrue*, 537 F. Supp. 2d 644, 659 (D. Del. 2008)).

Here, the ALJ considered all relevant factors in determining how much weight to afford the opinions of Dr. Kaufman, Dr. Park, and Mr. Mackell. The ALJ recognized that Dr. Kaufman and Dr. Park were Grier's treating psychiatrists, but explained that he gave their opinions "no weight" because their opinions were inconsistent with the evidence of record.[11] (D.I. 9-2 at 28)

---

[11] The plaintiff correctly acknowledges that a treating physician's opinion may be rejected outright on the basis of contradictory medical evidence. (D.I. 13 at 10) Plaintiff argues, without authority, that inconsistency is excusable because doctors are not writing notes in a patient's chart with litigation in mind. This excuse is unavailing and the medical chart speaks for itself.

The ALJ found that Dr. Kaufman's medication certification form dated February 2, 2015,[12] wherein Dr. Kaufman opined that Grier was unable to perform any full-time work, was inconsistent with his own treatment records. (*Id.*) For example, the ALJ noted that Dr. Kaufman's treatment records reflect that Grier's medication regimen was helpful, his anxiety was at a minimum, and that he was increasingly engaging in activities in the community. (*Id.*)

As to Dr. Park, the ALJ concluded that Dr. Park's medical certification form was similarly inconsistent with her treatment notes. (*Id.*) Dr. Park's medical certification form, dated March 7, 2016, stated that Grier was unable to perform full-time work. (D.I. 9-13 at 38) However, the ALJ noted that Dr. Park's treatment notes reflect that Grier's medication regimen was helpful with his auditory hallucinations, paranoia, and mood. (*Id.* at 29) Furthermore, the ALJ found that Dr. Park's August 10, 2016 Mental Impairment Questionnaire was inconsistent with the record in concluding that Grier's abilities were "seriously limited" to "poor" in a number of areas, including interacting appropriately with the general public and working in coordination with or proximate to others. (*Id.*) Treatment records from the same day show that while Grier occasionally experienced anxiety, paranoia, and panic attacks, these symptoms were decreasing, Grier's medication regimen was reportedly helpful, and Grier continued to lead a more active lifestyle. (D.I. 9-21 at 7-8)

The ALJ also assigned "no weight" to Mr. Mackell's opinion because his report was inconsistent with evidence of record and only restated Grier's subjectively reported symptoms. (D.I. 9-2 at 28) The ALJ noted that the treatment record indicates Grier's stable mental health symptoms when compliant with medication and his participation in more activities outside of his

---

[12] The ALJ states that this medical certification form was dated January 21, 2015, but the date of examination was marked as February 2, 2015. (D.I. 9-2 at 28; D.I. 9-13 at 16)

home. (*Id.*) Therefore, substantial evidence supports the ALJ's decision to assign "no weight" to the opinions of Dr. Kaufman, Dr. Park, and Mr. Mackell.

Grier suggests that the ALJ impermissibly relied on his own lay judgment to discredit the opinions of his treating medical sources. (D.I. 13 at 10, 14, 17) If an ALJ chooses to reject the treating physician's assessment, they may do so only on the "basis of contradictory medical evidence" not because of his or her "own credibility judgments, speculation or lay opinion." *Morales v. Apfel*, 225 F.3d 310, 317 (3d Cir. 2000) (citing *Plummer v. Apfel*, 186 F.3d 422, 429 (3d Cir. 1990); *Frankenfield v. Bowen*, 861 F.2d 405, 408 (3d Cir. 1988); *Kent v. Schweiker*, 710 F.2d 110, 115 (3d Cir. 1983)). Further, "an ALJ may consider his own observations of the claimant and this Court cannot second-guess the ALJ's credibility judgments," but that does not "override the medical opinion of a treating physician that is supported by the record." *Id.* at 318.

The ALJ did not substitute his lay opinion for the opinions of Dr. Kaufman, Dr. Park, and Mr. Mackell, but rather afforded their opinions no weight because of inconsistencies with the evidence in the record. Thus, substantial evidence supports the ALJ's evaluation of the opinions of Dr. Kaufman, Dr. Park, and Mr. Mackell.

## 2. Vocational Expert Testimony

Grier argues that the ALJ failed to describe with specificity all of Grier's demonstrated impairments in his hypothetical to the VE, thereby failing to consider all limitations in determining his residual functional capacity. (D.I. 13 at 6-7) The Third Circuit has held that "[a] hypothetical question must reflect *all* of a claimant's impairments that are supported by the record; otherwise the question is deficient and the expert's answer to it cannot be considered substantial evidence." *Ramirez v. Barnhart*, 372 F.3d 546, 552 (3d Cir. 2004) (internal quotations omitted) (emphasis in original) (quoting *Chrupcala v. Heckler*, 829 F.2d 1269, 1276

(3d Cir. 1987)). In *Ramirez*, the court found that the ALJ's hypothetical that excluded the plaintiff's limitations regarding concentration, persistence, or pace, was deficient. *Id.* at 554.

However, the Third Circuit has also recognized that in order "to accurately portray a claimant's impairments, the ALJ must include all '*credibly established limitations*' in the hypothetical." *Zirnsak v. Colvin*, 777 F.3d 607, 614 (3d Cir. 2014) (emphasis in original). "[L]imitations that are supported by medical evidence and are 'otherwise uncontroverted in the record' *must* be included in the ALJ's hypothetical for us to rely on the VE's response to that hypothetical." *Id.* (emphasis in original). If a limitation is supported by medical evidence, but opposed by other evidence in the record, "the ALJ has discretion to choose whether to include that limitation in the hypothetical." *See id.* at 615. "[T]he ALJ also has the discretion to include a limitation that is not supported by any medical evidence if the ALJ finds the impairment otherwise credible." *Id.*

Here, Grier's limitations are supported by some medical evidence but controverted by other evidence in the record, and it was therefore properly within the ALJ's discretion whether to submit the limitations to the VE. *See id.* at 615. For example, Dr. Park opined that Grier had "poor" abilities in interacting with the general public, "marked" difficulties in maintaining social functioning, and a "complete inability to function independently outside the area of [his] home." (D.I. 9-21 at 11-16) However, Dr. Park also noted that Grier had been going out more each day and had been challenging himself by engaging in activities outside of his home. (D.I. 9-17 at 11-13) More specifically, Grier fished with his family, exercised, swam, played basketball, and did yard work. (D.I. 9-15 at 22, 31; D.I. 9-17 at 11-14; D.I. 9-21 at 3-5) Therefore, the ALJ properly exercised his discretion to exclude Grier's limitation in his RFC finding.

### 3. Recontacting Medical Sources

Grier also argues that the ALJ erred when he failed to recontact Grier's treating medical sources in order to address inconsistencies, pursuant to 20 C.F.R § 416.920b. (D.I. 13 at 11-12) Grier acknowledges that the method by which the ALJ addresses an ambiguity or deficiency is discretionary, but argues that the ALJ failed to address the alleged insufficiencies and inconsistencies in the record. (*Id.* at 12)

20 C.F.R. § 416.920b(b)(2)(i) states that "[i]f the evidence is *consistent* but we have *insufficient* evidence to determine whether you are disabled, or if after considering the evidence we determine we cannot reach a conclusion about whether you are disabled . . . [w]e *may* recontact your medical source." 20 C.F.R. 416.920b(b)(2)(i) (emphasis added). In the case of inconsistencies in the case record, "we will consider the relevant evidence and see if we can determine whether you are disabled based on the evidence we have." 20 C.F.R. § 416.920b(b)(1).

Here, the ALJ weighed Dr. Kaufman and Dr. Park's inconsistent medical opinions against their own contemporaneous medical treatment notes. (D.I. 9-2 at 28-29) The ALJ then discredited the medical opinions based on their inconsistencies with the record. (*Id.*) Because the evidence was sufficient but inconsistent, the ALJ was required to weigh the evidence presented. *See Campell v. Colvin*, 2016 WL 4503341, at *3 (W.D. Pa. Aug. 29, 2016) ("An ALJ may only consider recontacting a treating physician, where the evidence is consistent but there is insufficient evidence to determine whether a claimant is disabled or after weighing the evidence the ALJ cannot reach a conclusion about whether a claimant is disabled. The ALJ, however, is not obligated to do so.") (internal citations omitted). Furthermore, even if 20 C.F.R. § 416.920(b)(2)(i) was applicable, the ALJ is not required to recontact medical sources but such

action is merely discretionary. *See id.* Therefore, the ALJ did not err in failing to recontact Grier's medical sources.[13]

### 4. Supportive Living Environment

Grier argues that the ALJ erred by failing to consider Grier's supportive living environment when assessing his RFC. (D.I. 13 at 17) Furthermore, Grier asserts that, according to the Agency's Program Operations Manual System ("POMS") DI 34001.032(D)(1), it is essential to consider the kind and extent of support a claimant receives. (*Id.* at 18)

When making the RFC assessment, an ALJ must consider, *inter alia*, a plaintiff's need for a structured living environment. *See* SSR 96-8p. The POMS DI 34001.032(D)(1) provides:

**Mental Disorders**

**D. How do we consider psychosocial supports, structured settings, living arrangements, and treatment?**

1. *General*. Psychosocial supports, structured settings, and living arrangements, including assistance from your family or others, may help you by reducing the demands made on you. In addition, treatment you receive may reduce your symptoms and signs and possibly improve your functioning, or may have side effects that limit your functioning. Therefore, when we evaluate the effects of your mental disorder and rate the limitation of your areas of mental functioning, we will consider the kind and extent of supports you receive, the characteristics of any structured setting in which you spend your time, and the effects of any treatment.

*Blackston v. Berryhill*, 2018 WL 1795422, at \*4 (W.D. Pa. Apr. 16, 2018).

Here, after analyzing the four functional areas, the ALJ noted:

There is no evidence that the claimant has had repeated episodes of decompensation, or that minimal increases in mental demands or change in the environment would cause him to decompensate, or that he has the inability to function outside a highly supportive living arrangement or a complete inability to function independently outside the area of his home.

---

[13] Furthermore, defendant notes that at the hearing before the ALJ, Grier never complained that the record was not developed, nor requested that the ALJ obtain any additional evidence. (D.I. 17 at 12-14)

(D.I. 9-2 at 24) The ALJ considered Grier's need for a structured living environment, and determined that there was no evidence that he was unable to function outside of a structured living environment. (*Id.*) Although Dr. Park opined that Grier was unable to "function outside of a highly supportive living arrangement with an indication of continued need for such an arrangement," the ALJ noted afforded this opinion no weight, because this limitation was not supported by the record. (D.I. 9-2 at 29)

As the court concluded in section (IV)(B)(1) *supra*, the ALJ's decision to afford Dr. Park's opinion no weight is supported by substantial evidence. Furthermore, substantial evidence indicates that Grier is not unable to function outside of a highly supportive living environment. Grier has increasingly engaged in activities outside of his home, such as fishing, playing basketball, exercising, swimming, and doing yard work. (D.I. 9-2 at 29; D.I. 9-15 at 22, 31; D.I. 9-17 at 11-14; D.I. 9-21 at 5) *See Walker v. Comm'r of Soc. Sec.*, 2013 WL 3967559, at *11 (W.D. Pa. Aug. 1, 2013); *Adorno v. Berryhill*, 2017 WL 6731623, at *2 (E.D. Pa. Dec. 29, 2017); *see also Capo v. Comm'r of Soc. Sec.*, 2018 WL 5982435, at *4 (W.D. Pa. Nov. 13, 2018) ("[I]t is unclear how the regulations and guidelines in effect at the time of [claimant's] hearing support [claimant's] contention that his living situation with his mother constituted a supportive living environment as contemplated by social security law."). Moreover, Grier's treatment providers encouraged him to obtain his own housing. (D.I. 9-16 at 3)

Therefore, the ALJ properly considered Grier's living situation and determined that he could function outside of a highly supportive living environment.

## V. CONCLUSION

For the foregoing reasons, Grier's motion for summary judgment is denied (D.I. 12), and the Commissioner's cross-motion for summary judgment is granted (D.I. 16). An Order consistent with this Memorandum Opinion shall issue.

Dated: July **3**, 2019

Sherry R. Fallon
United States Magistrate Judge